## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **J.P. MORGAN SECURITIES LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| | § | |
| **KEVIN B. ROSSOW,** | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S COMPLAINT

TO THE HONORABLE COURT:

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff") files this Complaint for a Temporary Restraining Order and Preliminary Injunction against Defendant Kevin B. Rossow ("Rossow" or "Defendant") and would respectfully show the Court as follows:

### I.
### INTRODUCTION

1.    This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendant that is concurrently being filed with FINRA Dispute Resolution.[1]

2.    This dispute arises out of the resignation of Rossow's employment with JPMorgan on July 12, 2024 and the subsequent commencement of his employment with Wells Fargo Clearing Services, LLC ("Wells Fargo"), a direct competitor of JPMorgan.  At the time of

---

[1] The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange.  JPMorgan has the express right to seek preliminary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes.  A true and correct copy of Rule 13804 is included as Exhibit A to the Declaration of Leonard Weintraub.

his resignation of employment, Rossow worked as a Private Client Advisor in a bank branch office of JPMorgan Chase in Longview, Texas.

3.      Defendant signed a Supervision, Arbitration, Confidentiality, and Non-Solicitation Agreement with JPMorgan, which prohibits him from soliciting JPMorgan's clients for a period of twelve months after the termination of his employment.  Defendant breached his agreement and is currently soliciting JPMorgan clients to move their accounts to him at Wells Fargo.

4.      In addition, on information and belief, Defendant improperly took with him to Wells Fargo JPMorgan's confidential client information, including client contact information such as cell phone numbers, which are generally not publicly available, without which he would have been unable to immediately commence calling and soliciting JPMorgan clients as soon as he resigned from JPMorgan.

## II.
## THE PARTIES

5.      Plaintiff JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York.  The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of FINRA.

6.      Rossow is a citizen of Texas and is an individual who resides in Gregg County, and may be served with process at his home address, 3218 Crenshaw Street, Longview, Texas 75605, or wherever he may be found.  Rossow was previously employed by JPMorgan in its Longview, Texas branch office, and is now employed by Wells Fargo in its Longview, Texas office.  Rossow maintains securities licenses through FINRA.

7.     In connection with his status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration before FINRA disputes, claims and controversies arising between himself and JPMorgan.

### III.
### JURISDICTION AND VENUE

8.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 based on JPMorgan asserting claims arising under the laws of the United States, specifically the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq. The Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367 because those claims are closely related to JPMorgan's federal claim and form part of the same case and controversy.

9.     The Court also independently has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiff JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in the Eastern District of Texas.

### IV.
### SUMMARY OF CLAIMS

11.     JPMorgan provides traditional banking, investment, and trust and estate services in Texas through its Chase Wealth Management branch offices.  Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to service a wide variety of JPMorgan clients' investment and banking needs.

12.     This dispute arises out of Defendant's departure from JPMorgan on July 12, 2024 and the immediate commencement of his employment with Wells Fargo, a competitor of JPMorgan.

13.     JPMorgan has learned that since resigning from JPMorgan and joining Wells Fargo, Defendant is soliciting JPMorgan clients to move their accounts from JPMorgan to him at Wells Fargo.  JPMorgan has learned that Rossow is calling JPMorgan clients, seeking to induce such clients to transfer their business relationships from JPMorgan to him at Wells Fargo.  The clients have informed JPMorgan that Defendant's communications have been more than simply announcing his change of employment; he is actively requesting meetings with clients or directly asking clients to move their relationships to his at Wells Fargo.

14.     More than a dozen JPMorgan clients formerly serviced by Rossow have informed JPMorgan that since Rossow resigned from JPMorgan, they received calls from Rossow, during which he solicited their business, asked the clients to meet with his at Wells Fargo, sought to discuss Wells Fargo and its services, or otherwise asked the clients to transfer their accounts to him.

15.     One client informed JPMorgan that Rossow called her after he resigned and asked for a meeting with the client.  The client told JPMorgan that Rossow had told her (falsely) that there was no longer a Private Client Advisor in the branch where Rossow formerly sat.

16.     Another client informed JPMorgan that she was moving her account to Wells Fargo because she was told that Wells Fargo had better interest rates.

17.     Another client similarly informed JPMorgan that Rossow had asked her for a meeting, and told her to bring her statements with her.  She further informed JPMorgan that he told her that if she moved her account to him, he can make her money grow better at Wells

Fargo.  The client informed JPMorgan that what Rossow said to her was "sneaky," and was visibly upset about her interaction with Rossow.

18.    Another client similarly informed JPMorgan that Rossow had left a voicemail for the client saying that he wants to try to save his clients the most money possible.

19.    Another client informed JPMorgan on August 22, 2024 that Rossow called him and asked him to move his accounts to Wells Fargo, telling the client that there is a lot more he can do for the client at Wells Fargo.

20.    Another client informed JPMorgan that Rossow called her before he resigned, and asked her to wait before adding new money to her JPMorgan account.  His purpose became clear to the client shortly after he resigned, when he called her again and told her that he would love to have her business, and that he could do a lot better for her at Wells Fargo.

21.    Another client informed JPMorgan that Rossow asked the client to move his account to Wells Fargo because they have better "stuff" at Wells Fargo.

22.    Another client informed JPMorgan that they moved their account to Wells Fargo because they have better programs.

23.    Another client summarized his interactions with Rossow after he resigned as follows:  "Based on some of the phone calls I've gotten I've gathered that he is trying to poach your clients, which I'm sure isn't an easy thing to deal with."

24.    Rossow's solicitation of JPMorgan clients is ongoing.  Two clients reported being solicited by Rossow on August 21 and 22, 2024, respectively.

25.    In addition, on information and belief, Defendant improperly took with his to Wells Fargo JPMorgan's confidential client information, including client contact information such as cell phone numbers, which, on information and belief, are generally not publicly

available, without which he would have been unable to immediately commence contacting and soliciting JPMorgan clients as soon as he resigned from JPMorgan.

26.     As discussed in more detail below, Rossow engaged in suspicious computer access on JPMorgan's system leading up to his resignation. That is, Rossow accessed an unusually high number of client profiles on JPMorgan's computer system.  The client profiles accessed by Rossow contain highly confidential client information, including client names, addresses, email addresses, phone numbers, and other information needed to contact and solicit JPMorgan clients upon his departure.

27.     Unfortunately, it appears that Defendant's improper solicitation efforts have proved successful, as 16 JPMorgan households, with assets in excess of $13 million, already have transferred their accounts to Defendant at Wells Fargo.

28.     At the time he left JPMorgan, Defendant serviced approximately 275 JPMorgan households, the vast majority of which were either pre-existing JPMorgan clients at the time they were assigned to him or were developed by him at JPMorgan with JPMorgan's assistance. Indeed, more than 40% of the clients whom Rossow serviced at JPMorgan had pre-existing investment accounts at JPMorgan prior to the time that Rossow became a Private Client Advisor. The clients serviced by Defendant at JPMorgan had a total of approximately $88 million in assets under supervision.  Defendant now seeks to improperly induce such JPMorgan clients to follow him to Wells Fargo.

29.     Defendant's conduct constitutes a breach of his employment agreement (which contains non-solicitation and confidentiality provisions), and a violation of his common-law obligations to JPMorgan.

30.     To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring his from further using JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claims against his in a related arbitration that JPMorgan is in the process of commencing.

## V.
## BACKGROUND

31.     Defendant commenced employment with JPMorgan or its affiliates/predecessors in March 2012, starting as a relationship banker with JPMorgan Chase.  While Rossow was a relationship banker and then a Private Client Banker (from the time he started with JPMorgan in 2012 through March 2017), he worked on the bank side, and did not manage any clients' investments.  In March 2017, Rossow entered JPMorgan's branch manager trainee program, and in August 2018 he because a branch manager of a JPMorgan Chase bank branch in Tyler, Texas. However, less than a year later, he went back to his position as a Private Client Banker, working on the "bank side," where he remained through October 2021.

32.     Rossow switched from the "bank" side of the business to the "investment" side in late 2021, and became a Private Client Advisor, in January 2022 at a JPMorgan Chase bank branch in Longview, Texas.  During the entire time that Rossow worked as a Private Client Advisor at JPMorgan, he worked at a JPMorgan Chase bank branch office located at 2606 Judson Road, Longview, Texas.

33.     In 2013, Rossow entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "Non-Solicitation Agreement").  The Non-Solicitation Agreement contains provisions prohibiting Defendant from

soliciting JPMorgan clients for a period of one year after the termination of his employment and requiring him to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information.

34.     As a Private Client Advisor, JPMorgan Chase referred its bank clients to Rossow in order for his to build JPMorgan's relationship with such clients.  Rossow sat at his desk at the JPMorgan Chase bank branch and was introduced to hundreds of existing bank clients (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management.  As a Private Client Advisor, Rossow was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan.

35.     JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years.  It is with great difficulty, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients.  JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  It typically takes many years of dealing with clients for JPMorgan to become their primary investing firm.  JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Private Client Advisor or other team members resign or leave JPMorgan.   But for Defendant's employment with JPMorgan, Defendant would not have had any contact with the vast majority of the clients the firm assigned to his and whom he is now soliciting.

36.     As part of his official duties at JPMorgan, Defendant had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment and trust and estates needs.  As explained in further detail below,

such information – which is not publicly available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor such as Wells Fargo.

**Defendant's Agreement and Obligations to JPMorgan**

37.    As noted above, Defendant entered into an agreement with JPMorgan during his employment that contains provisions prohibiting his from soliciting JPMorgan clients for a period of one year after his JPMorgan employment ends and from using or retaining JPMorgan confidential information.

38.    Section 7(a) of the Non-Solicitation Agreement, entitled "Confidential Information," provides, in relevant part, that:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

39.    Section 7(b) of the Non-Solicitation Agreement provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

> *i.   names, addresses and telephone numbers of customers and prospective customers;*
>
> *ii.  account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*
>
> *iii. specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information,*

*whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*

\*       \*       \*

*vi. all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*

\*       \*       \*

*viii. information concerning established business relationships;*

*ix. "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section.*

40.     In Section 7(c) of the Non-Solicitation Agreement, Defendant again expressly acknowledges that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

41.     In Sections 7(d) and 7(e) of the Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third party, and to return all JPMorgan Confidential Information upon the termination of his employment.

42.     In Section 8 of the Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

> a.  *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein,* **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers,**

*clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.*

b. *You understand and agree that JPMC has developed and uses a unique business model for the offering of investment and bank products and services, including without limitation the Chase Wealth Management and Chase Private Client platforms.  Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships With JPMS and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A.  Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC. The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill, reputation, name recognition, Confidential Information, specialized training, mentoring and expenditures made by JPMC. This platform and relationship modal developed by JPMC is special and unique to JPMC, providing you and JPMC with a unique opportunity to service and interact with clients and customers in ways not known or available to competitors.  You acknowledge that by utilizing the platforms, you will be given access to confidential information and/or trade secrets, which are not readily available through any public source and the protection of which represent a legitimate business Interest of JPMC.*

c. *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.* (emphasis added)

43.     Rossow had no prior industry experience before joining JPMorgan, obtained his securities licenses while at JPMorgan, and, on information and belief, brought no clients with him to JPMorgan.  In fact, Rossow was permitted to identify all client relationships that he had established prior to commencing employment with JPMorgan, and those pre-existing relationships would be carved out from the non-solicitation restriction in his Non-Solicitation

Agreement. The "Attachment A" to the Non-Solicitation Agreement – the space specifically designated for listing any pre-existing relationships – is blank (meaning Rossow identified no pre-existing client relationships).

44.     In Section 10(a) of the Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that he voluntarily entered into the agreement after having had an opportunity to review it with counsel:

> i.    *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*

> ii.   *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*

> iii.  *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving sales-related compensation for the sale of non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

45.     In addition, in Section 10(b) of the Non-Solicitation Agreement, Defendant acknowledged that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in

connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreement.

46.     In consideration for entering into and continuing his employment relationship with JPMorgan and executing the Non-Solicitation Agreement, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, securities registration, research, and health insurance.

## JPMorgan's Confidential Information and Client Relationships

47.     During the course of his employment by JPMorgan, Defendant had access to highly confidential JPMorgan client files in addition to other financial information that is confidential and proprietary to JPMorgan.  JPMorgan's client files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Defendant had no interaction with the vast majority of the clients he was assigned at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan.  As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

48.     A critical factor to JPMorgan's continued success is its relations with its clients. JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill.  JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its clients.

49.     JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients.  JPMorgan has invested substantial corporate resources to develop and maintain its client information.  The vast majority of the JPMorgan clients that Defendant serviced were developed by JPMorgan at great expense and over a number of years.  JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

50.     JPMorgan also has expended significant resources to service its clients.  These resources include millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services.  JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

51.     JPMorgan employs reasonable efforts to maintain the confidentiality of its client records.  Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are constant reminders about the confidential nature of the information contained on the records.  Employees such as Defendant must maintain client information as strictly confidential.  These instructions are confirmed in the agreements referenced above.

52.     The confidential information that Defendant, on information and belief, has taken or retained was entrusted to JPMorgan by its clients with the expectation that it would remain confidential and would not be disclosed to third parties.   Indeed, by law JPMorgan must safeguard this information until such time as the controlling authorities authorize its release. Defendant had access to this information solely by virtue of his employment by JPMorgan. JPMorgan and Defendant are obliged to maintain the confidentiality of this information.  For its part, JPMorgan took numerous steps to protect the confidentiality of this information.  Defendant was fully aware of, and responsible for, complying with JPMorgan's internal policies regarding confidentiality.  JPMorgan has implemented numerous other policies, and has established tight security, to ensure the confidentiality of its client information.   For example, access to JPMorgan's computer network by its professionals is password-protected.  JPMorgan also limits its client information to certain employees and management who need access to such information to perform their job functions.

53.     Employees such as Defendant must maintain client information as strictly confidential.  These instructions are confirmed in the agreement referenced above.

### **Defendant's Misconduct**

54.     As noted above, Defendant abruptly resigned from JPMorgan on July 12, 2024, immediately joined Wells Fargo, and began soliciting JPMorgan clients.

55.     As detailed above and incorporated herein, more than a dozen JPMorgan clients have informed JPMorgan that they received calls from Rossow after he joined Wells Fargo, requesting meetings with the clients, asking the clients to transfer their accounts to his at Wells Fargo, touting Wells Fargo and its services and investment options, or otherwise soliciting their business and attempting to induce the clients to do business with his at Wells Fargo.

56.    Defendant's solicitation of JPMorgan clients is ongoing and continuing.

57.    In addition, on information and belief, without misappropriating JPMorgan's confidential client information, Defendant would not have had clients' personal phone numbers and email addresses, and would not have had the ability to call JPMorgan clients immediately after he resigned.

58.    Rossow engaged in some suspicious computer access of JPMorgan's systems leading up to his resignation.  For example, on June 25, 2024, just two weeks prior to his resignation, Rossow accessed approximately 60 client profiles on JPMorgan's Advisor Central program in one day – a very high number for one day – approximately 20 of them in rapid succession during a 33 minute period.

59.    The client profiles accessed by Rossow in the weeks preceding his resignation contain highly confidential client information, including client names, addresses, e-mail addresses, phone numbers, dates of birth, account numbers, account types, account balances and specific investment holdings.  On information and belief, Rossow took such client information with his from JPMorgan to his new firm (by taking photos of the computer screens with his cell phone, copying, by intentionally trying to memorize the information, or via some other means), and is using such information at Wells Fargo to aid in his solicitation of JPMorgan clients.

60.    Defendant's misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients.  Unless Defendant's misconduct is immediately restrained and enjoined, other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

61.     Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, tortious interference, conversion, and unfair competition.   Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct.

62.     By improperly soliciting JPMorgan's clients, Defendant has caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages.   Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

> (a) Loss of JPMorgan clients and loss of client confidence;
>
> (b)  Use and disclosure of JPMorgan's confidential and proprietary information, including client lists;
>
> (c)  Injury to JPMorgan's reputation and goodwill in Texas;
>
> (d)  Damage to office morale and stability, and the undermining of office protocols and procedures; and
>
> (e)   Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## VI.
## COUNT 1 – BREACH OF CONTRACT

63.     JPMorgan, without waiving the foregoing, realleges and incorporates herein by reference the allegations above.

64.     Defendant breached his contract and agreement with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking and using JPMorgan's confidential documents and information.   By soliciting JPMorgan's clients and using and disclosing JPMorgan's proprietary and confidential information, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

65.     As a direct and proximate result of Defendant's breaches of his contract, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## VII.
## COUNT 2 – MISAPPROPRIATION OF TRADE SECRETS

66.     JPMorgan, without waiving the foregoing, realleges and incorporates herein by reference the allegations above.

67.     JPMorgan's confidential and proprietary business and customer information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information.  JPMorgan expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and customer information, including but not limited to restricting access to such information, designating such information as confidential, and requiring confidentiality agreements.   Accordingly, JPMorgan's confidential and proprietary business and customer information constitutes trade secrets pursuant to statutory and common law.

68.     Through the acts described above and incorporated herein, Defendant has misappropriated JPMorgan's trade secrets and confidential information in violation of the Texas Uniform Trade Secrets Act (Tex. Civ. Prac. & Rem. Code § 134A.001 *et seq*.) and common law.

69.     As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets and confidential information, JPMorgan has sustained and will continue to sustain

irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**VIII.**
**COUNT 3 – BREACH OF FIDUCIARY DUTY**

70.     JPMorgan, without waiving the foregoing, realleges and incorporates herein by reference the allegations above.

71.     As an employee of JPMorgan, Defendant owed JPMorgan a fiduciary duty of trust and loyalty.

72.     Defendant's fiduciary duties required his at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's confidential and proprietary business and customer information.  Defendant's fiduciary duties required his at all times to refrain from, among other things, soliciting JPMorgan's clients to join his at a competing company.

73.     Defendant breached his fiduciary duties to JPMorgan by engaging in the conduct alleged above.  Defendant engaged in such wrongdoing prior to the time he resigned from JPMorgan and after he joined JPMorgan's competitor, Wells Fargo.

74.     As a direct and proximate result of Defendant's breaches of his fiduciary duties, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**IX.**
**COUNT 4 – CONVERSION**

75.     JPMorgan, without waiving the foregoing, realleges and incorporates herein by reference the allegations above.

76.     At all times, JPMorgan was, and still is, entitled to the immediate and exclusive possession of its confidential and proprietary information, and all physical embodiments thereof, as alleged above.

77.     JPMorgan is informed and believes that Defendant took JPMorgan's confidential and proprietary information, including but not limited confidential client contact information, and converted such information for the use of Defendant and those acting in concert with her.

78.     The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

79.     As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**X.**
**COUNT 5 – UNFAIR COMPETITION**

80.     JPMorgan, without waiving the foregoing, realleges and incorporates herein by reference the allegations above.

81.     Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

82.     As a direct and proximate result of the Defendant's unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

# XI.
# PRAYER

WHEREFORE, PLAINTIFF J.P. Morgan Securities LLC respectfully requests that Defendant Kevin B. Rossow be cited to appear and answer, and respectfully requests that this Court award:

A.   Injunctive relief as requested above, first in the manner of a temporary restraining order,

B.   then as a preliminary injunction, until such time as a duly appointed arbitration panel renders an award in the underlying FINRA arbitration between the parties on JPMorgan's claims for permanent injunctive relief, enjoining and restraining Defendant directly or indirectly, and whether alone or in concert with others, including but not limited to directors, officers, employees and/or agents of Wells Fargo from:

    (a)   soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose names became known to Defendant by virtue of his employment with JPMorgan (or any of its predecessors in interest); and

    (b)   using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients;

C.   Ordering Defendant, and all those acting in concert with him, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's customers, employees and business, within twenty-four (24) hours of notice to Defendant or his counsel of the terms of such an order;

D.   damages in excess of one million dollars; and

E.   Such other and further relief, at law or in equity, to which JPMorgan may be justly entitled.

Dated: August 27, 2024

Respectfully submitted,

By: /s/ Amy M. Stewart

    Amy M. Stewart
    State Bar No. 24060660
    Email: astewart@stewartlawgrp.com
    Andre D. Johnson
    State Bar No. 24123462
    Email: ajohnson@stewartlawgrp.com
    **STEWART LAW GROUP PLLC**
    1722 Routh Street, Suite 745
    Dallas, Texas 75201
    Telephone: (469) 607-2300
    Facsimile: (469) 607-2301

    **ATTORNEYS FOR PLAINTIFF**
    **J.P. MORGAN SECURITIES LLC**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been forwarded to all known parties and counsel of record pursuant to the Federal Rules of Civil Procedure on this 27th day of August 2024.

Thomas B. Lewis, Esq.
Stevens & Lee, P.C.
Princeton Pike Corporate Center
100 Lenox Drive, Suite 200
Lawrenceville, New Jersey 08648
thomas.lewis@stevenslee.com

**ATTORNEY FOR DEFENDANT**

    /s/ Amy M. Stewart
    Amy M. Stewart